**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Business Health Property, Inc., | ) | CASE NO. 1:09 CV 1955 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Millers Capital Insurance Co., | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

### INTRODUCTION

This matter is before the Court upon Defendant's Motion for Summary Judgment (Doc. 25). Also pending is Plaintiff Business Health Property, Inc.'s Motion for Summary Judgment (Doc. 28). This is an insurance coverage dispute. For the reasons that follow, the motions for summary judgment are DENIED.

### FACTS

Plaintiff, Business Health Property, Inc., filed this lawsuit against defendant, Millers Capital Insurance Company, alleging that defendant wrongfully denied insurance coverage for property damage caused by freezing pipes.

1

Plaintiff is a limited partnership, in which Dr. Kevin Trangle possesses a 50% ownership interest.  Trangle is plaintiff's only "corporate" officer.  Trangle is also a 19% shareholder in Moore Counseling & Mediation Services, Inc. ("MCMS") and sits on its board of directors.

Plaintiff owns commercial property, which is insured by defendant under a commercial property insurance policy.  The property is managed by Trangle Properties, Inc., a corporation solely owned and operated by Trangle.  MCMS leased the property from plaintiff.  A written lease existed between the parties, which terminated on March 31, 2008.  The written lease provides that, as lessee, MCMS is obligated to [maintain/pay] utilities at the property.

At the time the initial written lease terminated, Trangle knew that MCMS was contemplating leasing different space.   Plaintiff and MCMS did not enter into a new written lease, but agreed instead to lease the space on a month-to-month basis at a reduced rate.  According to Trangle, the oral month-to-month lease contained a 90-day written notice provision before either party could terminate.[1]  In June or July of 2008, MCMS informed Trangle that it decided to lease space elsewhere.  However, the new space required a build-out and, accordingly, MCMS continued leasing the space from plaintiff on a month-to-month basis.

The parties offer widely divergent testimony regarding the date on which the month-to-month lease terminated.  Brian Moore, a majority owner in MCMS, testified that MCMS signed a lease for its new space in February of 2008.  According to Moore, he was physically at the new location by June of 2008, and that by August of 2008 MCMS was "pretty much" done with

---

[1]  Trangle's testimony is inconsistent given that a 90-day termination provision could not exist in a month-to-month lease.  In order to comply with the termination provision, the lease would have to have a term greater than 90-days.

plaintiff's space. Moore testified that he retained keys for the space in order to assist Trangle in showing the space to prospective tenants. On the other hand, Trangle testified that MCMS had a "significant amount" of materials, supplies, furniture, desks, chairs, and other equipment in the building. In addition, MCMS continued to use the meeting rooms for group presentations and classes. According to Trangle, he entered the building in January of 2009 in order to assess the state of the property for a new tenant. At that point, Trangle suspected MCMS would terminate the month-to-month arrangement at the end of January.

Although not argued by defendant, Trangle's testimony appears to be inconsistent with a document captioned, "Moore's Counseling and Mediation Services–Monies Owed (as of August 20, 2008)." The document was prepared by Trangle. In that document, Trangle indicates that he allocated certain payments received by MCMS to rent. Specifically, the document provides that rent was allocated for "April, May and June," and that "July was a freebie." Thereafter, Trangle makes MCMS a proposal as to how to resolve MCMS's outstanding debt. The document proposes a schedule for the "rest of 2008." On that schedule, it appears that new rent was not charged after July of 2008. Specifically, the document provides,

...[T]he schedule for the rest of 2008 would be as follows:

| | Apr-08 | May–08 | Jun–08 | Jul–08 | Aug–08 | Sep–08 | Oct–08 | Nov–08 | Dec–08 | Jan–09 |
|---|---|---|---|---|---|---|---|---|---|---|
| BHP new rent | $2000 | $2000 | $2000 | $2000 | $0 | $0 | $0 | $0 | $0 | $0 |

The document further indicates that MCMS owes nearly $28,500 in back rent. In addition, MCMS failed to make certain loan payments to entities associated with Trangle. MCMS owed nearly $12,500 for business loans to these entities. It appears that MCMS made two payments to Trangle in 2008. One payment of $2000 was made "earlier" in 2008. This

payment was allocated to "IMEx Consultation Services." A second payment of $3000 was made on August 16th, 2008, which was allocated to "IMEx Loan." Trangle did testify, however, that he received checks in December of 2008 and January of 2009 "that [were] for rent."

Defense counsel, however, did not question Trangle about this document or provide any evidence as to whether rent was charged or collected after July of 2008.

After MCMS began moving to its new space, Trangle instructed MCMS to turn the heat down to 50 degrees. Unbeknownst to Trangle, as of June 6, 2008, the heat was shut off at the property as the result of nonpayment. A lock was placed on the gas meter, which was located on the exterior of the building. From August of 2008 through November of 2008, MCMS showed the property to prospective tenants. At no point did anyone notify plaintiff that a problem with the heat existed. The original written lease required MCMS to "pay, directly to the appropriate supplier, the cost of all natural gas...supplied to the Property." Plaintiff never filled out a landlord notification agreement with the gas company, which would have resulted in direct notification to plaintiff of any shutoff of, or nonpayment for, gas service. According to plaintiff, he was not aware such a procedure existed.

Plaintiff did not employ a property manager to maintain the property. Trangle visited the property on November 11, 2008. He does not recall whether he checked the thermostat. According to certified meteorology records, the temperature on that date ranged from a low of 36 degrees to a high of 39 degrees. Trangle did not visit the property in December.

In early January of 2009, Trangle discovered extensive damage to the property caused by frozen pipes. Plaintiff notified defendant of the damage. The insurance policy provides as follows,

4

>   B.   **Exclusions**
>
>   2.   We will not pay for loss or damage caused by or resulting from any of the following:
>
>   >   e.  **Frozen Plumbing**
>   >
>   >   Water...that leaks or flows from plumbing, heating, air conditioning or other equipment... caused by or resulting from freezing, unless:
>   >
>   >   (1) You do your best to maintain heat in the building or structure; or
>   >
>   >   (2) You drain the equipment and shut off the supply if the heat is not maintained.

Mr. Brian Single began investigating the claim on behalf of defendant. Plaintiff points out that Single possesses no certifications or professional licenses. As appears customary, Single contacted Crawford & Company, an independent adjuster, to investigate the matter. Crawford & Company assigned Apryl Bailey to the investigation. Bailey believed that the claim should be covered. According to her report to Single, she indicated that she had performed an adequate investigation and that it was the responsibility of MCMS or the gas company to maintain heat. Single was unhappy with Bailey's investigation, but Bailey refused to do any further investigation. Single requested that a more experienced investigator be assigned to the claim. Crawford & Company assigned Phil Kaplan. Defendant never provided plaintiff with a reservation of rights letter.[2] On March 30, 2009, defendant denied plaintiff's claim on the basis that plaintiff failed to use reasonable efforts to maintain heat at the property.

Thereafter, plaintiff filed this lawsuit, which contains four claims for relief. Count one is

---

[2]  A reservation of rights letter is typically issued by an insurer where questions of coverage exist. In essence, the insurer is preserving its right to deny coverage at a later date.

5

a claim for declaratory judgment/breach of contract. Count two is a claim for bad faith. Count three is a claim for bad faith/breach of fiduciary duties. Count four is a "claim" for punitive damages. The parties cross-move for summary judgment and each opposes the other's motion.

### STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323. A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe

the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

### **ANALYSIS**

1. Count one (breach of contract/declaratory judgment)

The parties cross-move for summary judgment with respect to count one.  Defendant argues that the evidence conclusively establishes that plaintiff failed to "do its best" to maintain heat in the building.  According to defendant, no property manager took care of the property.  In addition, plaintiff failed to visit the property in December, even though he knew the property was either vacant or minimally used.  Moreover, although he visited the property in November, he had no recollection of checking the thermostat.  Defendant also points out that the high temperature on the day he came to the property was only 39 degrees.  Thus, plaintiff should have known that the heat was off.  According to defendant, the gas company shut off the gas nearly seven months prior to the alleged incident and placed a lock on the gas meter.  Although the gas company has a procedure that would allow plaintiff to receive notification if a tenant fails to pay the bill, plaintiff never filled out the form and, as such, did not receive notification of the shutoff.  Defendant further points out that plaintiff's principal, Trangle, was also a part owner in the tenant.  Plaintiff had some involvement in 2006 and 2007 in the oversight of MCMS's accounts payable and receivable.  At certain times, individuals employed by plaintiff were assigned to work on MCMS's finances.  Thus, according to defendant, plaintiff failed to use its "best efforts"

to maintain heat in the building because, as a part owner involved in MCMS's business, plaintiff should have known that the heat had been turned off for nearly seven months.  Regardless, defendant argues that plaintiff knew that MCMS was sometimes delinquent in making its rent payments and, as a result, plaintiff should have made an effort to learn whether MCMS continued to pay the gas bill after it vacated the premises.

On the other hand, plaintiff argues that the evidence establishes that it "did its best" to maintain heat in the building.  According to plaintiff, it entered into a binding lease with MCMS, which included a provision obligating MCMS to pay for all utilities.  Plaintiff points out that, prior to June of 2008, MCMS made utility payments and, as such, plaintiff had no reason to doubt that the payments were being made.  In addition, plaintiff points out that Trangle visited the property in November.  Trangle testified that he told MCMS to keep the heat turned down to 50 degrees.  Accordingly, he had no reason to notice that the heat was turned off.  Plaintiff also points out that the lock on the gas meter was small and was located at the back of the building.  According to plaintiff, Trangle had no involvement in the day-to-day activities of MCMS and was simply a minority owner.  As such, he had no way of knowing that MCMS failed to pay the gas bill.  Nor did he have a duty to ensure that MCMS paid the gas bill.

Both parties seek summary judgment on the grounds that the language in the insurance policy is clear and unambiguous.  This Court agrees.  "The question of whether the language of an agreement is ambiguous is a question of law."  *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (*citing Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)).  Where the terms of a contract are clear and unambiguous, the Court presumes that the parties' intent resides in the words utilized in the agreement.  *Gencorp, Inc. v. American Int'l Underwriters*,

8

178 F.3d 804, 817-18 (6th Cir. 1999).  Under Ohio law, common words appearing in the contract "will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992)(internal quotation and citation omitted).

In this case, the language requires plaintiff to "do its best" to maintain heat in the building.  Plaintiff points out that, generally speaking, "best efforts clauses" impose upon the promisor a duty to use "reasonable efforts" or "due diligence."  *See e.g., Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98, 100 (6th Cir. 1990).

Upon review, the Court finds that reasonable minds could dispute whether plaintiff used its best efforts to maintain heat in the building.  As an initial matter, the Court notes that the parties did not directly address the threshold issue in this case.  In order for plaintiff to survive summary judgment, there must be evidence that a lease existed between plaintiff and MCMS at the time the damage occurred.  In addition, the lease must have contained a provision requiring MCMS to maintain utility service at the premises.  Absent a lease with a provision to that effect, the responsibility of maintaining the heat fell solely on plaintiff.  Here, defendant provides evidence from Moore, a majority owner in MCMS, who testified that MCMS vacated that property in August.  Thus, according to Moore, no lease existed between MCMS and plaintiff during December of 2008 or January of 2009, the time period during which the damage occurred.  On the other hand, Trangle testified that a significant amount of MCMS's belongings remained at the property after August and that MCMS continued to use the space for business purposes.  Trangle also testified that he received rent checks from MCMS during December of

9

2008 and January of 2009.  It is unclear from the testimony whether these checks represented rent payments for those months, or whether they were "rent checks" for past due rent.[3]  Although the "Moore's Counseling and Mediation Services–Monies Owed (as of August 20, 2008)" document prepared by Trangle appears to indicate that no rent was charged to MCMS after July of 2008, defendant did not elicit any testimony regarding this portion of the document.  This Court simply cannot make assumptions as to the meaning of this document.  All in all, it is unclear whether a valid lease existed between MCMS and plaintiff when the damage occurred.  Some evidence exists tending to suggest a lease existed, *i.e.*, MCMS's belongings present at the property, MCMS's occasional use of the space, and Trangle's receipt of "rent checks" for December of 2008 and January of 2009.  On the other hand, some evidence exists tending to show that no lease existed, *i.e.*, Moore's testimony indicating that the lease terminated prior to December of 2008, and the document prepared by Trangle indicating that no rent was charged after July of 2008.  The Court finds that reasonable minds could differ as to whether a valid lease existed between the parties.

Nor can the Court determine whether the utility-payment provision contained in the written lease applied to the month-to-month lease negotiated by the parties.  After the written lease terminated, the rent was reduced.  In addition, Trangle testified that the month-to-month lease contained a 90-day termination provision.  Thus, it appears that at least some terms in the month-to-month lease may have differed from those in the written lease.  Neither party presents any evidence or argument as to whether the utility-payment provision extended into the month-

---

[3] It appears that, generally speaking, Trangle received payments from MCMS and allocated the funds between rent, loans, or the like.

to-month lease.

The Court notes that while the lack of a lease with a utility payment provision would prevent plaintiff from recovering under the policy, the existence of a lease does not automatically mean that coverage exists.  Rather, the policy requires that plaintiff use its "best efforts" to maintain heat.  Thus, even assuming plaintiff delegated its duties to MCMS, reasonable minds could differ as to whether plaintiff's reliance on MCMS to fulfill its obligations under the lease was reasonable.  Defendant points out that MCMS was sometimes delinquent in paying its rent.  Defendant fails, however, to provide specific details regarding the extent, frequency, and timing of the delinquencies.  These factual details are important to the analysis.  For example, if plaintiff knew that MCMS had failed to pay rent for the entire year preceding the damage, it may have been unreasonable for plaintiff to continue to rely on MCMS to pay the gas bill.  From the Court's review of the evidence, specifically Trangle's deposition testimony and deposition exhibit 39, it appears that MCMS was in fact, significantly delinquent in its rent payments in 2008.  Again, however, it is not this Court's function to search the record and make assumptions regarding documentary evidence that the parties do not address.  Defendant simply points out, without further elaboration, that MCMS was "sometimes delinquent" in its payments.  On the other hand, plaintiff argues that it had no reason to doubt that MCMS continued to pay the gas bill.  MCMS never informed plaintiff that it ceased making utility payments.  Trangle further testified that he believed MCMS had recently "freed up" cash.  Thus, while MCMS may have had difficulty paying rent or debt, MCMS should have had no difficulty paying minor utility bills.  The Court finds that reasonable minds could differ as to whether plaintiff's reliance on the utilities-payment provision (assuming one is applicable) was

11

appropriate.  Based on the evidence, the Court simply cannot say whether MCMS's delinquencies were significant enough to place a reasonable landlord on notice that MCMS was not fulfilling its obligations to pay the utilities.

In addition, while defendant points out that the gas supply to the premises was shut off nearly seven months prior to the water damage, the majority of this time consisted of warm weather months.  Moreover, Trangle testified that he instructed MCMS to turn the heat down to approximately 50 degrees when MCMS was not using the space.  Trangle visited the property in November and, according to plaintiff, this visit shows that plaintiff made a "reasonable effort" to maintain the heat.  Although Trangle testified that he could not recall whether he checked the thermostat, defendant points out that the high temperature on that date was 39 degrees.  There is no indication as to the temperature inside the building.  It appears that defendant is suggesting that Trangle should have been able to discern that the temperature inside the building was below 50 degrees and, therefore, Trangle should have realized that the gas was off.  This Court cannot say that reasonable minds could only conclude as such.  It is possible that the temperature in the building exceeded 39 degrees.  Therefore, Trangle may not have been able to discern the disparity between 50 degrees and the actual temperature inside the building.  As such, Trangle would not be aware that the heat was shut off.  In addition, while plaintiff made no effort to visit the property in December, a reasonable fact-finder could conclude that his visit the previous month was sufficient to constitute "best efforts" to maintain the heat.  Plaintiff also points out that a lock had been placed on the gas meter.  This meter, however, was located in the rear of the building and there is no indication that the meter was in plain view.

The thrust of defendant's argument is that Trangle, plaintiff's only corporate officer, was

also on the board of directors of MCMS. As landlord, plaintiff knew that MCMS had been delinquent on its rent payments. In addition, Trangle possessed intimate knowledge of the financial difficulties faced by MCMS. In fact, in 2006 and 2007, plaintiff loaned its staff to MCMS to assist MCMS with its accounting. At one point, all of MCMS's accounts payable were handled through *plaintiff's* office. Thus, unlike a typical landlord-tenant relationship, plaintiff possessed extensive knowledge of the financial workings of the tenant and had ready access to its books and records. In essence, it would have been simple for plaintiff to confirm (through MCMS) whether MCMS was paying the gas bill.

Plaintiff argues that Trangle's ownership interest in MCMS is irrelevant for purposes of the analysis. According to plaintiff, the Moores were responsible for the day-to-day operations of MCMS and Trangle cannot be liable for their acts and omissions. While this may be true, the issue of Trangle's *personal liability* for MCMS's failure to pay the utility bills is not before this Court. Rather, Trangle's ownership is relevant because Trangle and other individuals employed by *plaintiff* had ready access to MCMS and involvement in MCMS's affairs. That being said, however, the Court simply cannot say that Trangle's ownership interest and involvement with MCMS automatically means that plaintiff failed to use its best efforts. As an initial matter, there is no indication that plaintiff had any involvement with the day-to-day affairs of MCMS after 2007. Trangle testified that he was involved with MCMS only at the "macro" level. He further testified that he had no knowledge or involvement with the payment of monthly expenses. Rather, Trangle was concerned with the payment of rent and loans he made to MCMS. Accordingly, given that plaintiff's involvement in the day-to-day activities of MCMS appears to have ended in 2007, the Court cannot say that plaintiff failed to use its best efforts to maintain

heat because Trangle did not involve himself in MCMS's daily activities.

Defendant also argues that plaintiff failed to inform the gas company that it wanted notification in the event either MCMS failed to pay the bill or the gas company issued a shutoff notice. According to plaintiff, it was unaware of such a procedure. Plaintiff points out that even some of defendant's own employees were unaware of the procedure. In all, the Court cannot say that, as a matter of law, plaintiff failed to use its "best efforts" to maintain heat because plaintiff did not avail itself of the gas company's notification procedure.

2.      Counts two, three, and four

In counts two and three, plaintiff asserts claims for "bad faith" and "bad faith/breach of fiduciary duties." In count four, plaintiff asks for punitive damages.

Under Ohio law, "an insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, syllabus ¶ 1 (Ohio 1983). "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, syllabus ¶ 1 (Ohio 1994). The inquiry under this standard is whether "the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial," not whether the insurance company's decision to deny benefits was correct. *Rauh Rubber, Inc. v. Berkshire Life Ins. Co.*, 1999 WL 1253062 (6th Cir. Dec. 16, 1999) (citing *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir.1992)); *see also Hart v. Republic Mut. Ins. Co.,* 87 N.E.2d 347, 349 (Ohio 1949).

In this case, plaintiff points out that defendant engaged an independent adjustor to evaluate its claim. The independent adjustor assigned Apryl Bailey, an investigator, to

14

investigate the claim.  Bailey informed defendant that she believed the claim to be covered under the terms of the policy.  Defendant, unhappy with the investigator's performance, asked the independent adjustor to assign the claim to a different investigator.  In addition, plaintiff points out that defendant had no set criteria to use in order to determine how to analyze the "best efforts" exclusion.  Plaintiff further notes that defendant did not send a reservation of rights letter during his investigation.  This would have alerted plaintiff that defendant had questions as to whether the loss would be covered.  Plaintiff also points out that defendant failed to retain a portion of the piping at issue.   According to plaintiff, the piping may have shown that the sprinkler system caused the damage and not a frozen pipe.  In addition, plaintiff notes that defendant's adjustor did not possess any certifications or licenses.

Upon review, the Court finds that reasonable minds could disagree as to whether defendant engaged in bad faith in the handling of plaintiff's claim.  Specifically, plaintiff points out that defendant asked that a new independent investigator be assigned to the investigation, after the first investigator recommended that the claim be covered.  In response, defendant essentially claims that it bears responsibility for making claim determinations and, as such, Bailey's opinion is not relevant.  In addition, defendant claims that Bailey was not removed from this matter based on her opinion as to coverage.  Rather, defendant argues that Bailey "did not wish to continue" the investigation.  The testimony, however, reveals that Bailey indicated that she believed she fully investigated the claim and that no further investigation was necessary. The Court finds that, based on the recommendation of an independent investigator that the claim be covered, and the subsequent removal of that investigator at defendant's request, the Court finds that reasonable minds could differ as to whether defendant acted in bad faith in denying

plaintiff's claim.

    3.  Loss in value damages

Defendant argues that plaintiff is not entitled to recover damages for any loss in value to the property.  According to defendant, plaintiff failed to offer an expert report in this regard. Plaintiff does not respond to defendant's argument.  Accordingly, the Court finds that plaintiff may not seek loss in value damages from defendant.

**CONCLUSION**

For the foregoing reasons, the motions for summary judgment are DENIED, except that part of defendant's motion for summary judgment addressing loss in value damages is GRANTED.

    IT IS SO ORDERED.


    /s/ Patricia A. Gaughan  
    PATRICIA A. GAUGHAN  
    United States District Judge

Dated: 11/4/10